40019.  HIGDON GROCERY COMPANY et al.
v. FAIRCLOTH.

DECIDED APRIL 2, 1963.

*Conger & Conger, J. Willis Conger,* for plaintiffs in error.
*Miller & Kirbo, Bruce W. Kirbo,* contra.

RUSSELL, Judge.  The following evidence is undisputed: Highway 97 runs in a southerly direction from Bainbridge, Georgia, toward Chattahoochee, Florida, and, just south of the point of impact curves to the west.  The Bainbridge-Quincy road, curving from the east, comes into this highway in such manner that the Bainbridge-Quincy and Bainbridge-Chattahoochee roads make an acute angle.  The Bainbridge-Chattahoochee road has a continuous center-line strip suggesting that it is the main highway while the center line on the Quincy road is interrupted as the highways merge; however, there is a stop sign facing vehicles coming north from Chattahoochee to Bainbridge on Highway 97 as they approach the intersection.  The deceased Faircloth was traveling in this direction, the time being after sundown.  The Higdon vehicle, a large tractor-trailer weighing over 16,000

pounds and therefore limited to a speed of 45 miles per hour, was traveling south on Highway 97 and the driver, as he approached the intersection, gave a left-turn signal to show his intention of turning into the Bainbridge-Quincy road. The two vehicles collided head-on on the right-hand side of Highway 97 as to vehicles proceeding south, at a point where the highway widens because of the intersecting road. Skid marks revealed that prior to the impact the tractor-trailer traveled with wheels locked a distance of 177 feet 6 inches; that there were very short skid marks belonging to the 3-ton truck driven by the deceased, followed by other marks as the tractor trailer pushed the truck backward a distance of 60 feet and then went off the road and into the ditch on its right-hand side. The skid marks of the defendant's vehicle were partly on the right side and partly straddling the center line of Highway 97. To the question, "If he had continued his skid marks from a direction standpoint like they first started at the very beginning, he would have gone to Quincy?" a state trooper who examined the scene of the wreck replied: "Yes, sir, that's the direction from the first. Like I said, they all start in his lane of traffic, but that was a long truck, too, and the front of it would have had to have been on out there a ways and then they went across the center line so that they split the center line." The point of impact was 146 feet 8 inches north of the stop sign controlling the Faircloth vehicle. The Higdon driver was returning to the store after delivering produce in Bainbridge and had been working approximately 14 hours at the time of the wreck.

Belford, the defendant driver, further testified that as he approached the intersection of the road he saw the lights of the Faircloth vehicle and it kept coming and didn't stop; that he had already signaled his left-hand turn with the signal light and when he saw the other car was not going to stop he pulled to the right in an effort to avoid the collision but was hit anyhow; that it was his intention to go to the left until he saw the other car was not going to stop and he then pulled to the right and put on his brakes in an effort to miss the car that did not stop, and that he was traveling approximately 50 miles per hour. The plaintiff in error strongly urges that under this testimony a finding is de-

manded that plaintiff's deceased husband, by his failure to stop as required by law at the stop sign, was guilty of negligence per se proximately causing his death. However, this defendant also testified on deposition introduced in evidence for impeachment purposes as follows. "Q. Did you tell them (the State Patrolmen) how fast you were going? A. No, the best I can remember I don't think I did. Q. Well, they had you down as going 65 miles an hour? A. That's right. Q. And didn't you tell them that you were going that fast? A. You refresh my mind, I really, I did. Q. You told them you were going 65 miles an hour? A. I did." This testimony was contradicted on the trial by his statement that he was going about 50 miles per hour, was not going 65, and misunderstood the question on his deposition to mean only that the patrolman said he was going 65. Since the speed limit as applied to the defendant's vehicle was 45 miles per hour, either statement would show negligence per se on the part of the defendant; nevertheless, the question of whether the driver was traveling at 50 or 65 miles per hour (the latter speed being a violation regardless of the size of the vehicle) would be relevant both as bearing on the quantum of his negligence and on the question of comparative negligence. It was one of the substantial issues in the case. If the jury found this defendant deliberately contradicted his former testimony on deposition in an effort to improve his case they would be at liberty to disregard any other part of his testimony which they saw fit. *Code* §§ 38-1803, 38-1806; *Shannon v. Smith,* 96 Ga. App. 131 (3) (99 SE2d 569) ; *Georgia R. & Bkg. Co. v. Andrews,* 125 Ga. 85 (1) (54 SE 76) ; *Brown v. O'Neal,* 59 Ga. App. 560 (1) (1 SE2d 601). The opinion of a state trooper based on the skid marks and other physical evidence at the scene of the wreck placed the defendant's speed at 60 miles per hour; he further testified there was no evidence from which it could be ascertained whether or not the plaintiff's husband stopped at the stop sign, and that the latter's speed in his opinion, based on the damage to the Faircloth truck, was 65 miles per hour. The fact that he was on the left side of the road in relation to his lane of traffic is easily and probably correctly explained as an emergency effort to dodge the large tractor trailer which was over the center line

in the act of making a left turn into his lane of traffic. The question of what the plaintiff's husband might have done in this emergency situation to avoid collision was for the jury. *Epps v. Southern Bell Tel. &c. Co.*, 98 Ga. App. 252 (105 SE2d 361). "A person has a right to choose even a dangerous course, if that course seems the safest one under the circumstances." *Pacetti v. Central of Ga. R. Co.*, 6 Ga. App. 97, 102 (64 SE 302); *Morrow v. Southeastern Stages, Inc.*, 68 Ga. App. 142, 149 (22 SE2d 336). Speed alone in excess of the speed limit would not bar the plaintiff's recovery, especially in view of the fact that both vehicles were exceeding their respective limits, but would present a jury question as to whose negligence preponderated to cause the injuries.

Nor did the jury necessarily have to find that the plaintiff's husband disregarded the stop sign, but even if he had, as stated in *Johns v. Secress*, 106 Ga. App. 96, 98 (126 SE2d 296): "Negligence per se [in disregarding a stop sign] of which the deceased was admittedly guilty, is no greater as a matter of law than negligence as a matter of fact, and it is the right and province of the jury to determine the degree or amount of negligence attributable to each party and whose negligence is greater and whose and what negligence was the proximate cause of the injuries complained of." Here as there "the verdict shows that the jury apparently did in fact compare the negligence of the deceased and of the defendant and reduced the plaintiff's recovery on the basis of that comparison."

Since a verdict in favor of the defendants is not demanded as a matter of law, the trial court did not err in overruling the motion for judgment notwithstanding the verdict.

*Judgment affirmed. Felton, C. J., and Eberhardt, J., concur.*